UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

KAROLYN J. CLARK,  )
        Plaintiff,  )
          )
v.  )   No. 14 CV 50049
          )   Judge Iain D. Johnston
CAROLYN W. COLVIN,  )
Acting Commissioner of Social Security,  )
        Defendant.  )

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Karolyn Clark, brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision denying her social security disability benefits. For the reasons set forth below, the decision is remanded.

## I. BACKGROUND[1]

On December 22, 2010, Ms. Clark filed an application for supplemental security income alleging a disability beginning on December 31, 2003, although she later amended the alleged onset date to July 27, 2010, because she had filed an earlier application that covered the earlier period of time. R. 46, 178-83. Her application was denied initially, R. 96 & 97, and on reconsideration, R. 98 & 99. On September 19, 2012, the Administrative Law Judge ("ALJ") held a hearing to review the Social Security Administration's denial of Plaintiff's request for benefits. R. 40-73. Ms. Clark was represented at the hearing by counsel (different than the counsel who filed this appeal). Plaintiff and vocational expert Grace Gianforte ("VE") testified at the hearing, Ms. Gianforte by telephone.

### A.    Ms. Clark's Testimony

Ms. Clark testified that she blew her knee out six years earlier during which all of her ligaments and tendons snapped, and her meniscus and ACL each tore in three places. R. 48, 50. She testified that for three years afterwards she got around on crutches, and since then has used a walker or mobility scooter for trips longer than 20 steps. R. 47-48. According to Ms. Clark, without the walker her legs go limp like noodles, she has trouble keeping her balance, and has fallen and injured herself in the past. R. 49, 61. She testified that she has been refused surgery to

---

[1] The following facts are only an overview of the medical evidence provided in the administrative record.

repair her knee because she is uninsured. R. 50. Instead, she wears a knee brace that is bulky and uncomfortable. R. 54.

In addition to her knee injury, Ms. Clark described back pain that she attributes to one fractured vertebra and three compressed ones. R. 55-56. She testified that the back pain leaves her unable to get out of bed some mornings without assistance. R. 60. Ms. Clark stated that beginning two weeks before the hearing she also found herself unable to bend the fingers on her left hand or use that hand to grasp or lift anything. R. 55. She explained that although she is right-handed, "I just use my left hand for the majority of my stuff." R. 56. According to Ms. Clark, her primary care physician believes her fractured vertebra may be pinching a nerve that has led to the problems with her left hand. R. 55-56. She testified that the only way to know for sure would be back surgery, but because she is uninsured instead she scheduled an MRI for the week following the hearing. R. 44, 55.

During her testimony, Ms. Clark also described difficulty concentrating and thinking straight, difficulty expressing herself to others, serious paranoia, and insomnia. R. 54, 57, 59. She explained that the night before the hearing, she could not focus on her favorite movie, The Shawshank Redemption, and instead "was up, down, up, down, in and out of the kitchen, in and out of the doorway, you know, pacing back and forth to stretch my leg," which she suspected annoyed her guests. R. 59. She estimates being able to sit for only five to ten minutes before needing to get up to stretch her knee. R. 56. She testified that she travels from Rockford to Chicago Heights once a month to meet her psychiatrist, but during the one-and-a-half hour trip each way, she must stop about six times to get out to walk a little. R. 51-52.

She stated that she takes the following medication: Lamictal, Saphris, clonazepam, propranolol, Neurotin, Norco, Flexeril, and steroids.[2] R. 47. She testified she also uses an inhaler. *Id.* According to Ms. Clark, she has taken the anti-psychotic drugs for four years, and the pain medications for 12. *Id.*

B.  **Medical Records**

1.  **Physical Impairments**

Ms. Clark visited the emergency room on August 6, 2006, complaining of pain after hearing and feeling a pop in her left knee while playing on the floor in her home with her granddaughter. R. 450-52. Her doctor placed her knee in an

---

[2] According to the National Institutes of Health, Lamictal and Neurontin control seizures, clonazepam controls seizures and panic attacks, Saphris is an anti-psychotic, propranolol controls blood flow, Norco controls pain, and Flexeril is a muscle relaxant. *See generally* http://www.nlm.nih.gov/medlineplus/druginformation.html (last visited July 7, 2016).

immobilizer, gave her crutches, and scheduled an MRI.  R. 449 & 451.  The MRI of the left knee revealed a full-thickness chronic ACL tear, a vertical tear in the medial meniscus, and a Grade II sprain.  R. 449.  Her doctor prescribed physical therapy, which helped but did not eliminate the pain.  R. 448

  Nearly two years later, Ms. Clark sought treatment for both knees after they went "'snap, crackle and pop'" while walking her dog on July 4, 2008.  R. 444.  She was again given an immobilizer for her left knee and crutches and scheduled for an MRI.  *Id.*  During a followup visit on July 8, 2008, her doctor had difficulty examining her because she winced at the slightest touch or movement.  *Id.*  The MRI revealed a chronic ACL tear, chronic medial and lateral meniscus tears, and lateral femoral and tibial bone bruising.  R. 443.  Her doctor suggested non-surgical options such as working to increase her range of motion and to ween herself off her crutches.  R. 443.  On August 12, 2008, her doctor recommended physical therapy, R. 439, but during an examination on September 23, 2008, she told a physician's assistant that she could not afford physical therapy and instead performed exercises at home that she remembered from previous therapy visits, R. 437.

  On November 1, 2008, Ms. Clark visited the emergency after a series of falls after her knee reportedly buckled, with the latest fall fracturing her ankle.  R. 436.  She was initially placed in a splint, and during a followup visit with a physician's assistant on November 8, 2008, was moved to a tall cam boot.  R. 436.  On February 16, 2009, she again complained to her doctor of a popping in her left knee and pain in both knees.  R. 430.  She reported that she had never attended physical therapy because she could not afford it.  *Id.*  Her doctor suggested she attempt to perform the therapy herself at home.  *Id.*  He also noted that she would probably benefit significantly from a knee brace, but probably could not afford one.  *Id.*

  On February 12, 2010, Ms. Clark reported being in a "bad accident," had chronic pain in her left knee, and was prescribed a knee brace and crutches.  R. 352.  Throughout that year, she continued complaining of pain in her left knee and both ankles as well as her lower back and neck; she was assessed with chronic pain and pain syndrome; and she sought and obtained prescriptions for the pain medications Flexeril, Tramadol and Ultram.  R. 323-28, 346-49.  On August 11, 2010, she had diminished strength of 3 out of 5 in her left lower extremity, and reported being in constant pain of 10 out of 10.  R. 323.

  On April 5, 2011, she went to the emergency room reporting that the agency physician who examined her for disability benefits "was wrenching" her knee so badly that he left her with pain in her knee and tingling in her toes, but would not prescribe her pain medication.  R. 386.  She was given ten Norco pills for the pain and told to followup with her regular doctor because the emergency room was not the place for chronic knee pain.  *Id.*

On August 5, 2011, Ms. Clark returned to the emergency room for back pain she experienced after diving into a swimming pool the night before. R. 512. She reported experiencing similar pain in the past, and also stated that she had been camping and slept on the hard ground. *Id.* Her grip strength was limited, as was her strength in her lower and upper extremities bilaterally. *Id.* On September 14, 2011, Ms. Clark sought treatment at the hospital for a headache, dizziness, and trouble with her gait after falling off a ladder two days earlier. R. 475. X-rays revealed a compression deformity at L2, mild congenital hypoplasia of the L5 vertebra, and degenerative disc space narrowing at T11-12 through L2-3 with degenerative anterior spondylosis. R. 486. She was prescribed a C-collar. R. 599, 601.

On May 2, 2012, Ms. Clark was assessed with bilateral knee pain and chronic low back pain. R. 644. On August 10, 2012 she was against assessed with chronic low back pain. R. 670. In early September 2012 she went to the emergency room because she could not move her left hand and wrist, for which she was given a wrist splint. R. 700. On September 20, 2012, she was assessed with arthralgia of the left wrist. R. 697.

### 2. Mental Impairments

Ms. Clark has been diagnosed with bipolar disorder type 1, generalized anxiety disorder, R. 360, and post-traumatic stress disorder, R. 613. She took Lamictal, propranolol, Saphris, clonazepam, and Neurontin to control her symptoms. R. 613. In 2010, she reported to her psychiatrist that she suffered from poor concentration, distractibility, mood swings, and was tearful, irritable, and paranoid. R. 335-38. By January 2011, she reported that her mood swings were intense; she had manic thoughts; and she told her psychiatrist she was "not mentally fixable." R. 331, 333. On January 24, 2011, she reported she had not slept in two days. R. 331. Throughout 2011 she reported to her psychiatrist irritability, paranoia, anxiety, insomnia, and depression. R. 462-66. On February 17, 2012, she was admitted to the hospital after overdosing on prescription medication. R. 614. She denied suicidal ideations at that time, but reported three previous suicide attempts. *Id.* On July 18, 2012, in addition to bipolar disorder and generalized anxiety disorder, she was also assessed with panic disorder with agoraphobia and attention deficit disorder. R. 646.

### C. Opinion Evidence

The Social Security Administration arranged for state agency doctors to review Ms. Clark's medical records and opine on her abilities. State agency reviewing doctor Julio Pardo opined that Ms. Clark could occasionally lift 20 pounds, frequently lift 10 pounds, stand, walk, and sit for six out of eight hours, occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl, and never

- 4 -

climb ladders, ropes, or scaffolds. R. 398-400. State agency reviewing doctor Elizabeth Kuester opined that Ms. Clark had mild limitations in activities of daily living, moderate limitations in social functioning, concentration, persistence or pace, or one or two episodes of decompensation. R. 415. She further found that Ms. Clark's mental impairments cause moderate limitations in her ability to accept instructions and respond to criticism from supervisors, and in her ability to get along with co-workers and peers. R. 420. The opinions of Drs. Pardo and Kuester were affirmed by state agency reviewing doctors James Madison and Lionel Hudspeth. R. 427-29.

Ms. Clark presented an opinion from a reviewing neurologist, Dr. Julian Freeman, who found that since January 2006 Ms. Clark met Listing 1.02A because of degenerative arthritis of the knee with internal degrangement, gross anatomical deformity, and instability, and since November 2009 met Listings 12.02 and 12.04C because of a psychiatric disorder of mixed etiologies including mania and organic dementia. R. 311. According to Dr. Freeman's opinion, Ms. Clark was limited to walking and standing one hour a day in five minute periods, could not walk more than half a block, and could lift only 10 pounds occasionally and five pounds frequently, could occasionally bend, rarely kneel, crouch, crawl, and climb, and could never walk on slippery or rough terrain or climb ladders or scaffolds, and could not use precise, finely-controlled hand and finger movements. R. 316. He determined that by June 2009 her mental impairments precluded the reliable performance of even one or two step tasks, left her unable to maintain normal interaction with co-workers, supervisors, and the general public in any general work setting, or to adjust and adapt to any ordinary changes that might occur in working settings. *Id.*

### D. ALJ's Decision

The ALJ found that Ms. Clark had the following severe impairments: L2-3 lumbar spondylosis, L2 compression deformity, history of recurrent patellar dislocation and ACL injury, bipolar disorder, post-traumatic stress disorder, and polysubstance dependence. R. 25. He determined that Ms. Clark had no limits in activities of daily living, moderate limits in social functioning, concentration, persistence, or pace, and one episode of decompensation. *Id.* He found she had the residual functional capacity ("RFC") to perform light work except no climbing ladders, ropes, or scaffolds, only occasional stopping, crouching, kneeling, crawling, and balances, and was limited to simple, unskilled routine work involving no extensive public interaction. R. 27. He agreed with the opinions of the state agency doctors, and gave no weight to the opinion of Dr. Freeman. R. 30-31. He found the plaintiff's statements not credible to the extent they were inconsistent with the RFC he had determined. R. 28. And finally he found that because sufficient jobs were available in Illinois that Ms. Clark could perform, such as bakery worker, food sorter, polisher, and bench worker, that she was not disabled. R. 31-33.

The plaintiff argues that the ALJ's decision must be overturned for three reasons. First, she argues that the ALJ improperly rejected the opinion of her nonexamining source, neurologist Dr. Julian Freeman. Second, she argues that the ALJ did not properly account for all of her impairments. Third, she argues that the ALJ improperly found that her subjective complaints were not credible.

## II. ANALYSIS

**A.     Standard of Review**

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

Additionally, as the Seventh Circuit has repeatedly held, the federal courts cannot build the logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 CV 2993, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014) ("In the Seventh Circuit, an ALJ's decision can be supported by substantial evidence – or even a preponderance of the evidence, as it is here – but still will be overturned if the ALJ fails to build a 'logical bridge' from the evidence to her conclusion." (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996))); *Jensen v. Colvin*, No. 10 CV 50312, 2013 U.S. Dist. LEXIS 135452, at *33-34 (N.D. Ill. Sept. 23, 2013).

**B.     Dr. Freeman's Opinion**

Ms. Clark offers several arguments why the ALJ erred in his rejection of reviewing neurologist Dr. Julian Freeman's opinion, which Ms. Clark presented in support of her application for benefits. According to the Social Security Regulations, an ALJ is required to "consider all of the following factors in deciding the weight [to] give to any medical opinion[:]" (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c); 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6). These are the "checklist factors." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

The ALJ offered three reasons for assigning "no weight" to Dr. Freeman's opinion. R. 31. First, he rejected the opinion because it concluded that Ms. Clark met Listings 1.02A, 12.02 and 12.04, contrary to his own conclusions---presumably based on the opinions of the state agency doctors---that she met no Listing. Second, he rejected the opinion because it concluded that she could not walk and stand more than five minutes at a time, or travel distances farther than one-half block at a time, and could not walk on slippery or rough terrain despite evidence that Ms. Clark "travel[ed] at will between towns." R. 31. Third, he rejected it because Dr. Freeman is not qualified to offer opinions in the psychiatric area.

In assessing Dr. Freeman's opinion, the ALJ did not reference the checklist or explicitly apply the relevant factors, which this Court has viewed as required. *See Duran v. Colvin*, 2015 U.S. Dist. LEXIS 101352, at **8-9 (N.D. Ill. Aug. 4, 2015). Without explicit analysis, the Court cannot be certain that the ALJ's conclusions accounted for the checklist factors.

But even if implicit analysis was sufficient, the ALJ still failed to demonstrate that he properly accounted for the factors. In essence, he appears to have rejected the opinions of Dr. Freeman merely because they differed from those of the state agency doctors, without explaining why the state agency doctors' opinions were more persuasive or even how they supported the ALJ's conclusions. For instance, the ALJ acknowledges the plaintiff's "chaotic movements," but concludes they "are not necessarily an indicator of inability to sustain work," rather, they show that she "cannot tolerate extended interpersonal interaction." But the ALJ does not explain how the state agency physicians' assessments support that conclusion. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) ("ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves").

In addition, the ALJ failed to explain how any other part of the record supports his rejection of Dr. Freeman's opinion. For example, the ALJ rejected Dr. Freeman's opinion that the plaintiff could stand or walk no more than 5 minutes at a time, could walk no more than one-half block at a time, and could not walk on slippery or rough terrain as improbable because she traveled freely between the Rockford, Chicago and Peoria areas for doctor appointments, and because a consulting psychologist's notes that after arriving early for her appointment, an unidentified person in the psychologist's office observed her walk across an uneven lawn and over two curbs to get to the Walgreen's store next door. R. 30-31, 393. But the ALJ did not purport to take into account the plaintiff's testimony that she did not drive to these appointments alone, may have been a passenger rather than the driver, and stopped six times to stretch during the one-and-one-half hour trips because she could not sit for long periods of time. R. 50-52.

The ALJ also failed to explain how the plaintiff's ability to walk next door over an uneven surface, makes it "improbable" that she can stand or walk no more than five minutes and no farther than one-half block. Nor did he explain how the medical evidence documenting her numerous physical impairments such as the chronic ACL tear in her left knee, R. 449, chronic medial and lateral meniscus tears, and lateral femoral and tibial bone bruising, R. 443, her compression deformity at L2, mild congenital hypoplasia of the L5 vertebra, and degenerative disc space narrowing at T11-12 through L2-3 with degenerative anterior spondylosis, R. 486, and prior prescriptions for a knee brace, crutches, R. 352, and a C-collar, R. 599, 601, supported the state agency doctor's opinion that she could stand and walk for six out of eight hours, R. 398-400, rather than Dr. Freeman's opinion limiting her to standing and walking for five minutes at a time, R. 316.

Finally, the ALJ did not explain his basis for concluding that Dr. Freeman lacked qualifications to offer an opinion in the psychiatric area. Presumably the ALJ reached this conclusion because Dr. Freeman identified himself as being a doctor of internal medicine and neurology, not a psychiatrist. But in addition to his training in internal medicine and neurology, Dr. Freeman also identified as the basis for his analysis and opinion his training in psychiatry at the Mayo Clinic, as well as his "treatment of 4,000 individuals with psychiatric diagnoses and manifestations, and additionally, diagnostic and functional capacity evaluation of about 3500 individuals with known or suspected psychiatric illnesses for the Department of Defense, with predictive accuracy exceeding 99%." R. 311. The ALJ acknowledged none of this. A medical expert does not need to be a psychiatrist to offer a medical opinion about mental health limitations. *Sprague v. Bowen*, 812 F.2d 1226, 1231-32 (9th Cir. 1987) (noting that primary care physicians identify and treat the majority of Americans' psychiatric disorders, and therefore district court erred concluding that there was no relevant mental health evidence because none was offered by a board-certified psychiatrist); *see also Thomas v. Colvin*, No. 15-2390, 2016 U.S. App. LEXIS 11323, at *13 (7th Cir. Jun. 22, 2016) (ALJ not entitled

to completely disregard opinion of non-specialist because "all licensed medical or osteopathic doctors are acceptable medical sources."). The ALJ could take into account Dr. Freeman's background when weighing his opinion, *see* 20 C.F.R. 404.1527(c)(5), but as noted the ALJ did not engage in weighing, rather, he outright rejected Dr. Freeman's opinions about the plaintiff's mental limitations as "gratuitous." R. 31.

Because the ALJ did not properly weigh the opinion of Dr. Freeman against the other medical opinions and evidence in the record before rejecting the opinion, he did not build a logical bridge from the evidence to his conclusion. For this reason, the plaintiff is entitled to a remand. *See Wallace v. Colvin*, No. 14 CV 50359, 2016 U.S. Dist. LEXIS 82753, at *17 (N.D. Ill. June 27, 2016) (failure to properly weigh opinion evidence alone is reason to remand).

## C.     Residual Functional Capacity

Next, Ms. Clark argues that the ALJ also erred by failing to account for all of her limitations in his RFC. Because the Court has already determined that the ALJ's failure to properly weigh Dr. Freeman's opinion is basis alone for remanding, the Court addresses these additional arguments only briefly.

First, Ms. Clark argues that the ALJ erred by finding that she had no restrictions in activities of daily living while at the same time adopting the report of state agency reviewing doctor Elizabeth Kuester who opined that Ms. Clark had mild limitations in activities of daily living. R. 415. The Commissioner did not respond to Ms. Clark's argument. By failing to explain how he could both adopt the opinion that Ms. Clark had mild limitations in activities of daily living, but then adopt an RFC based on no limitations, the ALJ failed to build a logical bridge between the evidence and his conclusion.

Second, Ms. Clark argues that the ALJ erred when he found she had moderate difficulties with concentration, persistence or pace, R. 26, but did not include that limitation in his RFC and instead, merely restricted her to simple, unskilled routine work, R. 27. In *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010), the Seventh Circuit found that limiting a claimant to unskilled, simple, repetitive tasks does not adequately account for moderate limitations in concentration, persistence, or pace. However, Ms. Clark's argument fails to account for the following limitations the ALJ set out to the vocational expert during Ms. Clark's hearing: "The claimant has . . . moderate restrictions describes [sic] maintaining fast and traditional pace and likely would experience at least one or two episodes of decompensation of extended duration . . . ." R. 64-65. Even under *O'Connor-Spinner*, the failure to explicitly include a claimant's concentration, persistence and pace limitations in her RFC is not error if the limitations are otherwise conveyed to the vocational expert. *Id*. at 619. By failing to acknowledge

- 9 -

that the ALJ conveyed to the vocational expert Ms. Clark's moderate limitation at least as to pace, she has forfeited any argument that the ALJ's articulation of her limitations was inadequate. *Goo v. Colvin*, No. 15 CV 5858, 2016 U.S. Dist. LEXIS 83540, at *6 n.1 (N.D. Ill. June 28, 2016) (arguments that are undeveloped and unsupported by authority are forfeited).

Third, Ms. Clark argues that the ALJ erred when he limited only her interaction with the public, even though a state agency doctor also concluded that she would also have moderate limitations dealing with supervisors and co-workers. R. 419-20. The state agency doctor noted Ms. Clark's limitations first by ticking the "Moderately Limited" boxes within Section I ("Summary Conclusion") of the Mental Residual Functional Capacity Assessment form that asked about her abilities to interact with supervisors and coworkers. Dkt. 419. But later in Section III of the form that calls for a narrative assessment of the claimant's mental RFC, the state agency doctor noted that, "claimant could relate acceptably with supervisors and coworkers to the minimal and superficial extent typical of simple work." Under DI 25020.010 of the agency's Program Operations Manual System, the Summary Conclusion portion of the Mental RFC form is merely a "worksheet to ensure that the psychiatrist or psychologist has considered each of the pertinent mental activities . . . . **It is the narrative** written by the psychiatrist or psychologist in section III . . . **that adjudicators are to use as the assessment of RFC**." DI 25020.010(B)(1) (emphasis in original). Given that the ALJ limited Ms. Clark to simple work and according to the state psychologist's narrative Ms. Clark could relate acceptably with supervisors and coworkers when performing simple work, Ms. Clark has not established that the ALJ failed to account for her limitations.

Finally, Ms. Clark contends the ALJ's assessment of her RFC failed to explain why he included no hand or manipulation limitations despite evidence that her left wrist had a limited range of motion and very weak grip strength, R. 697, 700, and limited her to occasional stooping, crouching, kneeling, crawling, and balancing without explaining how she could perform those activities despite her limited cervical and lumbar spine ranges of motion, R. 365, 373-75. On remand, the ALJ will have the opportunity to better explain how his RFC is supported by the medical evidence of her wrist, cervical, and spinal limitations.

## D. Credibility

Next, Ms. Clark contends that the ALJ erred when evaluating her credibility. The ALJ found that although Ms. Clark suffered from impairments that could reasonably be expected to cause her symptoms, her statements about the intensity, persistence and limiting effects of her symptoms were not credible. But Ms. Clark contends that in reaching that conclusion, the ALJ failed to take into account much of the evidence of her impairments, found inconsistencies where none existed, and neglected to account for the pain medications doctors prescribed.

The Social Security Administration recently updated its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p (effective March 28, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. Because SSR 16-3p is a clarification of rather than change to the Administration's interpretation of existing law, its application to matters on appeal is appropriate. *Hagberg v. Colvin*, No. 14 CV 887, 2016 U.S. Dist. LEXIS 56172, at *22 (N.D. Ill. Apr. 27, 2016). Because Ms. Clark's appeal is being remanded for other reasons, the ALJ will have the opportunity to reevaluate her subjective symptoms in light of SSR 16-3p.

### III. CONCLUSION

For the reasons given, the plaintiff's motion for summary judgment is granted, the government's motion is denied, and the case is remanded for further consideration.

Date: July 8, 2016

Iain D. Johnston
United States Magistrate Judge